IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PARK PLUS, INC.
83 Broad Avenue
Fairview, NJ 07022

    *Plaintiff*                                                          Civil Action No. _____

v.

LEXINGTON INSURANCE COMPANY
100 Sumner Street
Boston, MA 02110-2103

    Serve On:
    Maryland Insurance Commissioner
    7 St. Paul Street, 24th Floor
    Baltimore, MD 21202

    *Defendant*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**COMPLAINT FOR DECLARATORY JUDGMENT
AND COMPENSATORY DAMAGES**

Plaintiff Park Plus, Inc. ("Park Plus"), by its undersigned counsel, brings this action for Declaratory Judgment and Compensatory Damages and states as follows:

**NATURE OF THE CASE**

1. Park Plus brings this action pursuant to 28 U.S.C. §2201 for the purpose of determining questions in actual controversy between Park Plus and Defendant Lexington Insurance Company ("Lexington") concerning that Defendant's obligation to indemnify Park Plus for a judgment entered against it on May 24, 2022, in *Palisades of Towson, LLC v. Park Plus, Inc.*, Case No. C-03-cv-20-001888, in the Circuit Court for Baltimore County.

- 1 -

As alleged more fully herein, although that judgment is covered under the provisions of primary and excess liability insurance policies issued to Park Plus by Defendant Lexington, Lexington has refused to indemnify Park Plus for any portion of that judgment, so that Park Plus was required to pay that judgment without any contribution from Lexington.

## PARTIES

2. Plaintiff Park Plus is a corporation with its principal place of business in New Jersey, incorporated in Delaware. At all times pertinent to this action, Park Plus has been in the business of installing automated parking systems, among other things.

3. Defendant Lexington is an insurance company which, on information and belief, is organized under the laws of the State of Massachusetts, with its principal place of business in Boston, Massachusetts. At all times pertinent to this case, Lexington has insured certain risks in the State of Maryland and is registered with the Maryland Insurance Commission to sell its insurance products in Maryland.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 as the matter in controversy involves a dispute between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

5. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) in that Defendant Lexington conducts business in this District, the case concerns the resolution of insurance obligations related to a judgment issued by a Maryland court, and a substantial part of the events giving rise to this case occurred in this District.

## FACTS ALLEGED

6. Lexington issued a commercial general liability policy #037666097, for the policy periods 08/19/2010 to 08/19/2014, to named insured Park Plus, Inc. ("the CGL Policy"). The pertinent provisions of the CGL Policy were the same throughout the period it was in force. Throughout the policy periods, the CGL Policy had an "each occurrence" limit of $1,000,000.00, a general aggregate limit of $10,000,000.00 (by endorsement), and a products-completed operations aggregate limit of $2,000,000.00.

7. Lexington also issued a commercial umbrella liability policy #00823-10-00252, for the same policy periods as the CGL Policy ("the Umbrella Policy"). Throughout the policy periods, the Umbrella Policy had an "each occurrence" limit of $5,000,000.00, and a products-completed operations aggregate limit of $5,000,000.00. The pertinent provisions of the Umbrella Policy provide for indemnification of the insured under the same general terms as does the CGL Policy. (The two policies are referred to, jointly, as "the Policies").

8. Under the insuring agreements of both the CGL Policy and the Umbrella Policy, Lexington agreed to pay those sums that Park Plus becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which that insurance applies, the triggering event for coverage under the Umbrella Policy being exhaustion of the applicable limits of the CGL Policy in payment of defense costs, settlement and/or judgment. Under the CGL Policy, Lexington agreed to provide a defense, at its expense, to Park Plus for any suit seeking such damages.

9. The Policies define "property damage," in pertinent part, as: "physical injury to tangible property, including all resulting loss of use of that property," and, also as "loss of use of tangible property that is not physically injured."

10. Under the Policies, any such "bodily injury" or "property damage," to be within the applicable insuring agreement, must have been caused by an "occurrence," defined in both Policies, as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."

11. As explained more fully below, on May 24, 2022, the Circuit Court for Baltimore County, Maryland, entered judgment against Park Plus, and in favor of Palisades of Towson, LLC ("Palisades"), in the amount of $2,813,231.63, which was a judgment on an arbitration award issued on March 5, 2020, by arbitrator Steven A. Allen ("the Award").

12. The arbitration in which the Award was issued involved a claim by Palisades in connection with an automatic parking system ("the APS") installed by Park Plus at Palisades' apartment building in Towson, Maryland, known as "The Palisades of Towson." ("the Location"). In that arbitration, Palisades alleged that the APS had various defects that caused Palisades to incur damages, including for replacement parking and transportation for tenants at the Location, and increased security due to the loss of use of the APS, and, ultimately, required a retrofit of the APS by another company. Park Plus, in turn, sought an award against the Palisades of unpaid maintenance and related fees.

13. The arbitrator, in a written Arbitration Decision, and an accompanying Award, copies of which is attached hereto as Exhibits A and B, respectively, and incorporated herein, entered an award in favor of Palisades as to at least some of the relief

- 4 -

it requested, and also entered an award in favor of Park Plus as to at least some of the relief it requested.

14. The arbitrator explained his findings and reasoning in the Arbitration Decision, Exhibit A hereto. Among other things, the arbitrator found as follows:

a. Park Plus and Palisades entered into a written contract dated May 4, 2009, for Park Plus to install the APS, which was to be used for tenant parking, at the Location, and that this APS was handed over to Palisades as completed on August 31, 2010.

b. Sotefin, S.A. ("Sotefin"), a non-party independent contractor, provided Park Plus with the mechanical components of the APS and the software used in the APS, Sotefin directed Park Plus's installation of the APS, and Sotefin sent an engineer to the Location to check the installation of the APS in terms of the mechanical and electrical equipment.

c. On February 13, 2012, there was a fatal accident in the APS when, following a malfunction in the APS, a Palisades' employee was crushed while manually attempting to remove a vehicle from the APS when the shuttle on which he was riding fell down one of the four elevator shafts in the APS ("the Fatality").

d. Because of the Fatality, two of the four elevator lift systems in the APS used to move vehicles into and out of the APS had to be closed, the shuttle used to move vehicles to and from the elevators was damaged, and a number of tenant and other vehicles were stuck in the garage and/or could not be retrieved and used by their owners.

e. This required that Palisades rent vehicles for those tenants and/or provide them with alternative transportation for an extended period of time.

  f. After the Fatality, the APS was entirely shut down from February 24, 2012, until June of 2012, when two of the four elevator systems were reopened, and the entire APS did not reopen until the Spring of 2013.

  g. Palisades, after the Fatality and resulting closure of the APS, provided alternate parking for its tenants and the other users of the APS until June 2018, in the Washington Avenue garage near the Location.

  h. Palisades, during this time period, also hired security personnel to protect those tenants who parked in the Washington Avenue garage.

  i. The primary problems with the APS were persistent issues with the cables that were attached to the shuttles that moved vehicles in and out of the APS to the elevators, and the operational software, both of which were provided to Park Plus by Sotefin, an independent contractor.

  j. Because of these problems, and the aftereffects of the Fatality, Palisades engaged Westfalia Engineering, a non-party, to perform a "retrofit" of the APS, at a cost of $3,274,622.27, and the APS, after Westfalia's "retrofit," was ready for use as of December 1, 2017.

  15. As reflected in the Arbitration Decision, Exhibit A hereto, the arbitrator found that "Park Plus was negligent in connection with the design and installation of the APS . . . and its inability to successfully address the various problems . . . after delivery." *Arbitration Decision*, p. 13.

  16. Based on this finding, the arbitrator awarded damages to Palisades as follows:

      a.      $2,333, 220.00 reflecting part of Westfalia's charges to retrofit the APS;

      b.      the cost to Palisades of alternative parking at the Washington Avenue garages, as follows;

          i.      $74,311.50 for the period February through June 2012;

          ii.      $130,683.00 for the period June 2012 through March 2013;

          iii.      $499,200.00 for the period September 2015 through June 2015;

      c.      $95,082.00 reflecting the cost to Palisades of additional security related to the use of the Washington Avenue garage for alternative parking from August 2015 through February 2017;

      d.      $46,304.14 representing the cost to Palisades of providing alternative transportation to tenants whose vehicles were unable to be retrieved from the APS through June 2014.

      17.      The total Award to Palisades, per Exhibit B hereto, was $3,178,800.64.

      18.      The arbitrator also awarded $365,677.69 to Park Plus, per Exhibit B, hereto, on Park Plus's counterclaim against Palisades for unpaid work performed on the APS, so that the net Award to Palisades was $2,813,123.15.

      19.      After the Arbitration Decision and Award were issued, Lexington informed Park Plus that it was not obligated to pay, and would not pay, any portion of the Award against Park Plus.

      20.      Lexington also took the position that, as the result of the issuance of the Arbitration Decision and Award, it no longer had any obligation to provide a defense to Park Plus, despite the filing by Palisades of a complaint in the Circuit Court for Baltimore

County, Case No. C-03-cv-20-001888, in which Palisades sought to have the Award entered as a judgment that could be enforced against Park Plus ("the Enforcement Action"). It was only when Park Plus's counsel pointed out to Lexington that, under the terms of the CGL Policy, Lexington had an obligation to continue to defend Park Plus at least until a judgment had been entered, including resolution of any appeals, that Lexington agreed to continue to provide a defense to Park Plus.

21. However, because Lexington made clear that it would refuse to indemnify Park Plus for any portion of a judgment entered against it based on the Award, and after the Circuit Court advised in the Enforcement Action that it was inclined to enter an enforceable judgment against Park Plus in that Enforcement Action, Park Plus was forced to enter into an agreement with Palisades that would stay entry and enforcement of such a judgment until all appeals had been exhausted ("the Stay Agreement").

22. The Stay Agreement required Park Plus to made substantial periodic payments to Palisades, which were held in escrow pending resolution of appeals, and also required Park Plus to give up its rights to collect the $365,677.69 it had been awarded by the arbitrator even were Park Plus to prevail on its appeal(s) of the Award.

23. After all appeals had been resolved in Palisades' favor, and entry of judgment was imminent in the Circuit Court in the Enforcement Action, Palisades agreed to reduce the judgment to which it would otherwise have been entitled to $2,915,000.00, which represented the sum of $1,515,000.00 previously paid into escrow by Park Plus, plus an additional payment of $1,400,000.00 made by Park Plus on July 1, 2022, to Palisades. Thus, to keep Palisades from enforcing its judgment, which would have had devastating

consequences to Park Plus and its business, and in the face of Lexington's refusal to pay any portion of the judgment on the Award, Park Plus was forced to pay $2,915,000.00 to Palisades.

## COUNT ONE [DECLARATORY JUDGMENT]

24. The allegations of paragraphs 1 through 23 are incorporated herein by reference as if fully realleged herein.

25. The arbitrator, as set forth in the Arbitration Decision and the Award, made findings that constitute "property damage," as that term is defined in the Policies, including for physical injury to tangible property and resulting loss of use, and for loss of use of tangible property that is not physically injured.

26. The arbitrator, as set forth in the Arbitration Decision and the Award, made findings that constitute such "property damage" caused by an "occurrence," as that term is defined in the Policies, including the Fatality and the express findings of negligence by Park Plus.

27. The arbitrator, as set forth in the Arbitration Decision and the Award, made findings that the deficiencies in the APS were primarily in the cabling and in the software, both of which were provided by a subcontractor, Sotefin, which also directed Park Plus's installation of the APS.

28. There is no exclusion in the Policies that negates Park Plus's right to be indemnified for the amounts it paid Palisades for "property damage" caused by an "occurrence."

29. An actual controversy exists among the parties to this litigation concerning the nature, scope, and extent of insurance coverage for the judgment under the Policies.

30. A declaratory judgment is necessary to resolve the dispute and end the uncertainties between the parties concerning their respective rights, duties, and obligations under the Policies.

WHEREFORE, Park Plus prays for the following relief:

A. That this Court declare the rights, duties. and obligations of the parties;

B. That this Court declare Lexington has an obligation to indemnify Park Plus for the amounts it paid to satisfy the judgment in favor of Palisades;

C. That this Court enter an award of attorney's fees, expenses, and costs in favor of Park Plus in connection with this case, and

D. For such other and further relief as this Court deems just and proper.

## COUNT TWO [BREACH OF CONRACT]

31. The allegations of paragraphs 1 through 30 are incorporated herein by reference as if fully realleged herein.

32. Lexington, under the CGL Policy, had an obligation to indemnify Park Plus for the amount of the judgment entered against Park Plus in favor of Palisades, and, to the extent that such judgment exceeded the applicable limits of the CGL Policy, had an obligation to indemnify Park Plus under the Umbrella Policy for such excess judgment.

- 11 -

33. Despite demand by Park Plus for indemnification, Lexington failed and refused to indemnify Park Plus for any of that judgment, in breach of its contracts of insurance with Park Plus.

34. Park Plus has satisfied all of its obligations under the Primary Policy and the Umbrella Policy.

35. Lexington's breach of contract has damaged Park Plus.

WHEREFORE, Park Plus demands compensatory damages of $2,915,000.00 from Lexington, plus prejudgment interest, interest, attorneys' fees, and costs of this action.

*/s/ Kathleen M. McDonald*
Federal Bar No.:00764
Baldwin|Seraina, LLC
111 South Calvert Street
Suite 1805
Baltimore, Maryland 21202
Telephone: (410) 385-5695
Facsimile: (443) 703-7772

*Attorney for Plaintiff Park Plus, Inc.*